We'll call the case of Kelsey Baker v. Jeremy Stumpf v. Stuart Stuyvesant, 5-12-0585. My name is Greg Fenton, and I'll be speaking on behalf of Stuyvesant Baker, David Trout, who are also present with me, and co-counsel David Warren, who may have some things to say, because he, like I, have a very high passion and a great deal of respect for the people of Stuyvesant. Also in court is Kelsey Baker, whose constitutional rights were at issue in this case, and I believe were violated. Mr. Penley, if you intend to have Dr. Horan speak, I think you'll need to split your time and let the court clerk know. That's not something usually done in this court. Have you done that? We have not. Do you have an objection to that? No. Do you have an objection? If you'll let her know before you start. Oh, my. Is that okay? You have to sign in. Sure. Sign in. I'm sorry. Let her do that paperwork. Okay. Thank you. Sorry for the interruption. No problem. On page 3 of our report, there's Exhibit 21. Exhibit 21 is the medical record of Kelsey Baker from St. Anthony's Medical Center, showing 10 pairs of burns or scars, which are distinctive case remarks on her body. We would ask the court to familiarize itself with that exhibit to show the harm that was done and the damages that was done to this young lady. Exhibit 21 was sketched by a doctor who I submit wanted somebody to look and see what happened to this lady on February 6, 2006. The underlying background facts are undisputed with regard to this defendant. Ms. Baker was seated in the back of a sheriff's vehicle, a cruiser. She was handcuffed behind her back. She was not a threat to flee. She was not armed. She did not strike or hit any police officer when she was placed in the vehicle. She was not a danger to anyone when she was seated in the back of the police car passively waiting to be transferred. She was just under arrest, handcuffed in the back of the police car. And even in that situation, the Constitution gives her rights, the right not to be treated in the fashion she was treated with an excessive force. There is no justification, legal justification, factual justification, for what happened to her at that point in time. Was your case limited to a 1983 action? Well, we also had filed a battery claim, but the only claim that was submitted to the jury was an 1983 claim. Why was that? That was just a strategic decision on our part because of the immunities involved. And did you ask for a judgment at the conclusion of the plaintiff's case? We did not. We did post-trial. Not before the case ended? Well, we thought we did it, but there's nothing on the record that suggests that we did. I think that the judge was of the opinion that we did it, but there was nothing on the record suggesting that. And the defense never claimed that we didn't timely raise the issue. They would claim that in the brief year or in the court below. They did not claim that we did not raise that issue timely before submission to the jury. Because we always intended that once this witness testified, once he made the admissions that he made, that there was really little left for the jury to decide, and there was an argument about the jury instructions and what they should include and what they should not include, obviously, what elements the jury had left to decide. But I cannot represent that the record would show that there was a motion for a direct converting to the plaintiff. The questions which brought about what you claimed to be the admissions were framed in a hypothetical manner, weren't they? No, they weren't, because they are supported by the undeniable physical evidence. I'm not going to what the basis and the record is for your questions. I'm saying the way they were phrased, they were phrased in a hypothetical manner, weren't they not? I don't believe so, and the reason I don't believe so is because you have to ask some questions before other questions. Of course. And that doesn't make them hypothetical. It just means they perceive the other evidence and perceive the other questions. These were not phrased in hypothetical terms. These were phrased in absolute terms, and the way that the examination of the witness went was, you know, we wanted to establish that he needed to follow the sheriff's policies, and he did not follow the sheriff's policies, and we needed him to admit that if he didn't follow the sheriff's policies, which were the minimum constitutional guidelines that the sheriff gave to his officers in the field, then, you know, then you go to the next question, and I don't think that makes it hypothetical. I just think it precedes the other questions, and the number of times that Ms. Baker was shot is not hypothetical. That's, you know, that's, he's admitted, he's admitted shooting her more than his police report indicates. He's admitted, he's admitted not only in his examination but also in this, in the brief here that she, you know, and he's not denying the computer printout. He's not, he's not denying the undeniable. He's not denying that there's four computer printouts, and he's not denying the damages caused on Exhibit 21. He cannot deny that. I don't think this court would allow him to deny that this lady was tortured in the back of her vehicle with all these burn marks and all these scars, and that doesn't make those questions hypothetical. That just means that in the sequence of the examination, they were asked first. Now, the determination as to whether a statement by a witness is an admission or not is a matter of discretion by the trial judge in light of all the evidence and an evidentiary call in the trial judge's discretion. Is that correct? I believe so, Your Honor. I think the question of whether or not these are judicial admissions is a question of law that the court reviews de novo. It's the treatment of the admissions that's given the discretionary standard. So the first issue that the court would have is whether, and de novo review is, are these judicial admissions? And we submit in our brief, in our reply brief, that these are de novo decisions as a matter of law. Are these, and I know His Honor has written opinion on these in other cases. I have. Whether or not these are hypothetical questions or whether or not they're fact questions. And that, we believe, is a de novo determination, whether or not it is or not. But once you make that decision, then it's the court's abuse of discretion in that matter and implying that legal conclusion. I guess I'm having trouble understanding. The evidence came in just as you wanted it to come in, right? Right. And the jury gave you a bad result. So now you're coming back and saying the court erred not treating them as judicial admissions. Only because you failed to grant the J&OB? Yes, and most of the trial. And the judge had a lot of difficulty with that. He really thought about it for a long time. I've never had a post-trial motion like that before where the judge went back and forth on it. He had a lot of thought about it for a long time. And I think he wavers a lot in our presence. But because once things are admitted in open court by a witness, why isn't that? Why doesn't that stop that? Well, that's why I asked you if you asked for a judgment at the conclusion of your case or the defendant's case. Well, as the court probably knows, when we fight about jury instructions, we talk about those issues a lot. And most of those discussions are off the record. And we don't really, you know, we're fighting so hard we don't know when there's a court report there, when there's not a court report there. So that's our explanation as to why. And I don't think the judge felt that this was not a timely, untimely issue. He had it before him. It was clearly before him. And he just wavered. He denied our motion. So I think that's how it broke down. Of course, I know that's how it broke down to those there. But, you know, before I turn it over to Mr. Horne, the only thing I would ask the court to consider is how to, because there is no other case like this in Illinois. How do we want police officers to treat young people who have been drinking and are arrested and are in the back of the police? How do we want them to treat them? That's a constitutional issue for the court. How do we want kids who are inexperienced drinkers, how do we want them handled? This is a question for society. I suggest that this was a dog. This person would be charged with animal cruelty. This was a waterboarding case. It's no different than those. She's being tortured because she won't sit up. I mean, that cannot be a constitutional justification for the harm that's demonstrated on Exhibit 21. With that, I'll turn it over to you. If you look at the brief that's on Page 2 at the bottom, there are new facts that are being admitted here in their brief. They say that although the computer printout of Stuyvesant's taser registered four uses of his taser during that four-minute period, there is no other evidence to support that it was used more than twice. Stuyvesant testified he used this taser on Baker twice. That is new. At the time that this was argued at the end of the trial, they were arguing that all of the uses of the taser by Stuyvesant, who is a 6'5 guy who was not the arresting officer, Stumpf was the arresting officer. Stuyvesant is a 6'5 guy that came at her in Stumpf's police car. When she was in the back, already shackled. Kelsey is a chef, a mother, and she pulled over into this driveway, of course, when she thought that she had too much to drink. Stumpf came by. Officer Stumpf came by, and I think the jury found that he was reasonable. I could definitely see that the jury found that he was reasonable. Stuyvesant then came in. Stumpf went into the house. Stuyvesant came in, opened up the door, and started tasing Kelsey. Stuyvesant is no longer with the police force, as you probably know. And here, for the first time, if we look at what I asked Stuyvesant on the stand was this. You have these policies and procedures for Madison County. This is for the use of a taser. If you don't follow these procedures, is that excessive force? And he said yes. And I specifically asked him this. If you cannot justify all of the use of the taser that you used on Kelsey Baker, would you agree that you used excessive force on Kelsey Baker? Answered correct. So if you used your taser and it was unaccounted for, you would agree that was excessive force. If you used the taser on a person unaccounted for, yes. That's an admission when the chief of police comes in and says computer printout, and this witness also said that the computer printout is totally reliable. Now they are for the first time, because this is not what was told to Judge Hill. Judge Hill was told that all of these shots were justified and that all these shots were accounted for. And now they're saying, although this computer printout of Stuyvesant's taser registered four uses of the taser during the four-minute period, there's no other evidence to support that it was used more than twice. That's because Stuyvesant only wrote down that he used it twice. But he used it four times on Kelsey. That is an admission of excessive force. That's our point. Any questions? Thank you. Thank you. Mr. Leighton. Yes, Your Honor. Mr. Leighton. Philip Leighton. I'm an assistant state attorney with Madison County, Illinois. I'm a police and court counsel. Just to clear up a couple issues quickly that were addressed in the introductory remarks. Mr. Fenlon stated that Mr. Baker did not strike or hit anyone. That's absolutely not true. Prior to her being tased in the back of the squad car, when the door was opened up by Deputy Stuyvesant, the reason why he tased her was because she was not obeying a lawful command to sit up. It was kicking him repeatedly as he was trying to bring her into compliance and to sit her up in the seat. So to represent to this court that there was no physical altercation, that he just opened up the squad car door and started tasing her is not accurate at all. Wasn't that the extent of her refusal to sit up something that was in dispute? I mean, the first incident, according to the facts, was that she began kicking when she was drinking and that caused the two tasers by Officer Stump, which she came into compliance, was handcuffed, and then put in the car and then fell asleep. Stuyvesant seems to say that when he opened the door, her feet fell out. Now are you saying that she was kicking when the door was opened? Stuyvesant's testimony at trial was that after he opened the door and her legs were out of the door, that she was kicking him repeatedly. And there was numerous references in the record to his testimony that she was kicking him when he opened the squad car door to sit her up into her seat belt. Absolutely. And was there any testimony that he ever went to Officer Stump for assistance or tried any other less intrusive methods for sitting her up? The Officer Stump was in the house at the time interviewing the two complainants who had actually called the Sheriff's Department at the time. So no, that was not. There was some argument at trial about whether he was equipped with a collapsible baton, and he indicated that he didn't feel it was appropriate to use a collapsible baton or a pepper spray or a sea spray. So that was the evidence that was at trial at the time. And in addition, there was another statement that I think that needs correction, too, is that Mr. Cullen also pointed out that we didn't object to the lateness of the issue of the judicial admissions. That was clearly raised in our response to the plaintiff's motion for JNOB. In our response, we state, additionally, at the time of trial in this matter, that the plaintiff did not raise an objection that a stylist's testimony was a judicial admission, and as such, the plaintiff has waived this argument. And I think that that's an important distinction to bring out here, the procedure of how this issue came up. There was—the plaintiff has framed this issue, and I apologize for that, a little bit of a quote, as that Judge Hilla erred in failing, in the context of a motion for JNOB, to determine that deputy stylist's testimony constituted a judicial admission. Judge Hilla never had the opportunity during trial to do the thing that they now complain that he didn't do, which is to deem this testimony as a judicial admission. They didn't raise this in their case in chief. They didn't file a motion for direct verdict to disclose their evidence. They didn't do anything prior to the jury returning a verdict in favor of the defendants to bring this matter to the attention of the court. And I think that that's extremely important because, as the court has remarked earlier, this is an evidentiary issue that the trial court has to have brought to their attention during the case to make rulings on those evidentiary issues. That was, I think, Justice Wolters' comment. So it's the defendant's position, as was stated in our response to JNOB, that the fact that this was not addressed prior to the jury returning a verdict for the defendants in this case results in the fact that the plaintiff has waived or forfeited this argument on appeal. I also think it's important to discuss the standard of review here. There's a clear dispute as to what the standard of review is, and I was pleased to see a couple of faces here today that had offered some of those opinions to pass on what I believe is the appropriate standard of review. The plaintiff cites two cases to this court that says that the appropriate standard of review in this case is the NOVA. That's the Burns v. Micheletti case, which is a Second District opinion, and Hansen v. Ruby Construction, which is a First District opinion. I've read these cases many, many times. Nowhere in either one of these two cases are the words de novo even used. Nowhere. They're not in the case. So I don't understand how it can be represented to this court that it's a de novo standard of review of what was done. To the contrary, the defendant cites two cases which we believe are controlling and fair directly on these issues. That's the Raft v. Carbondale case, which I believe two of the three of you sat on and authored and concurred in that opinion, and the Smith v. Pavlovich case was on that one as well. And it's clear, crystal clear from those cases as to what the appropriate standard of review is and it's an abuse of discretion. The court in that case held that an abuse of discretion standard applies when reviewing a circuit court's treatment of judicial admissions. An abuse of discretion may be found only where no reasonable person would take the view adopted by the circuit court. And in the Smith case, which we've cited, I think a 2009 case, the circuit court found or the appellate court found that Judge Kimball did not abuse of discretion in failing to treat testimony as a judicial admission. The case law is also pretty clear as to what you have to do in order for a statement to be deemed a judicial admission. It's a deliberate, clear, unequivocal statement by a party about a concrete fact within that party's knowledge. There's extensive requirements and it's a very high threshold that the court takes very seriously from an evidentiary basis for something to be determined as a judicial admission. If you look and you're required to look at the totality of all of the evidence and testimony presented to determine whether or not the statements at issue rise to that high level of constituting a judicial admission. It's clear from the record in this case that that is not what occurred. Every opportunity Deputy Syverson had, he repeatedly denied not only the operative facts that formed the basis of the hypothetical questions that he was asked, but he denied that he violated taser policy on the evening of the incident. He denied that he violated any policies of the Department of Justice. But the basis of this denial was his testimony that he only tasered twice? His testimony was that he only tasered twice. That was the basis for his denial, correct? He denied, there's kind of two issues here. There's the definition that was raised in their brief. There's the issue of the number of tasers, the time to choose tase, and then there's a separate issue regarding her sitting up in the back of the car. I'm looking at the Madison County policy versus his testimony. And the only reason he denies to be violated, at least it appears, correctly if I'm wrong, is because he still continues to claim to have tasered twice despite the evidence in the computer. He admits, however, correctly if I'm wrong, that if the computer is correct, he would have violated the policy of the Sheriff's Department. What his testimony was was that the computer printout speaks for itself. That data is downloaded by somebody other than him after the fact. But he does admit that he tasered twice. He disputes that he tasered four times. So there's a clear dispute as to that issue. And there was conflicting evidence, clearly. My question to you was, is there an admission by him that if he tasered twice, that would have violated, although he doesn't believe he did it, if the evidence is that he tasered four times, that that would have been a violation of the Madison County Sheriff's Department policy? No. He does not? He does not. He denied consistently to trial that any policies of the department were violated on the evening of the insane question. So, and there was evidence that was introduced to trial, Your Honor, that even explained away these additional contact points that were made. Because as the plaintiff was kicking the deputy, as he's applying the taser, a testimony from the experts and from Deputy Stuyvesant was this, the taser was operated on what's called a stun drive, so it's a five-second application of the electronic stun device. And it's made, it's not shooting a gun where the barbs come out. It actually has to make physical contact with the skin, where the electricity can arc between the contact points. As a person, if you have that on, turned on, in stun drive, lasts for five seconds. That was a testimony. As a person is kicking and screaming, the gun breaks contact with the skin. It can break contact, resulting in different points of contact on the thighs and the leg as the person is jumping around. The peritoneal area where he's tasered is high up toward the groin area, isn't it? There were a series of taser marks around the, between the thigh and the outside of the leg. That's correct. And where she's kicking at him, he would have put himself in harm's way, it seems, because he's got to go over the long leg that's kicking at him. Do you understand my point? My understanding is that her legs were outside of the squad car at the time this was happening. Right, and he's got to reach in to get this one particular point that causes the most damage and the most pain in order to gain her compliance. My understanding is that the nerve is on the outside of the thigh. Okay. But again, I'm not a medical doctor, so one of the reasons I went to law school. I understand that. Let me ask. Pardon? Right, exactly, exactly. Even if he can't stand the sight of blood. Was there specifically a question asked of the defendant that if you used the taser four times, would that be a violation of the clause? That question was not asked, Your Honor. The way that it was brought up in that context was that if the two issues that it would have, again, Deputy Cyprus has said he used it twice. The plaintiff says he used it, it's stuck up, or the taser four times. The way that that was brought up in that context was if those additional applications were unaccounted for, would that necessarily mean that there was a violation of the policy? That's how the question was phrased. It wasn't saying if you taser her four times, did that violate the policy? And we would submit, even under these facts, that it would not violate the policy. And keep in mind, too, that violation, there's no foundation. This is an ultimate issue of the case as to whether or not the use of force by Deputy Cyprus was excessive. This is an illegal inclusion. There's no foundation laid in trial for him to be an expert witness on excessive force. I mean, there were experts on both sides on what constitutes excessive force. And the jury was specifically instructed that violation, just because there is a violation of a department policy, that doesn't rise to the level of a constitutional violation. And that is the law, and that's what the jury was instructed in this case. Did at any time the defendant make any statement that he, in fact, tased the plaintiff more than twice? No, he did not. Under any circumstance? No, Your Honor. And I think it's also important that I think, just in case you brought this out earlier, that this is evidence. Nothing was excluded. The jury was – nothing was taken away from their consideration as a result of this. They heard all of the evidence and testimony of Deputy Stuyvesant, all of the witnesses. Nothing was excluded based on objection. In fact, I was giving John Gilbert, who tried to take some of our time, because as I was reviewing Deputy Stuyvesant's testimony, every objection he raised was overruled by Judge Hill at the circuit court. So, I mean, nothing, no part of Deputy Stuyvesant's testimony was kept out. So there's no – there's no harm in this case to the plaintiff by saying this same evidence that was admitted to the jury, received by the jury, considered by the jury, in the full context of the case, not only of Deputy Stuyvesant, but of all of the witnesses, that this now – the failure to treat it as something other than what we believe that it is, because I don't believe that they've met the requirements to treat this as conditional admission, that that failure by Judge Hill in a post-trial motion for J and OV now constitutes reversible error. And we certainly don't believe that under the facts submitted that there's any evidence whatsoever that the court abused this discretion. So, thank you. Thank you. Mr. Fennelly. Excuse me. Yes, your Honor. I hope I didn't mistake the facts. My point was that when Kelsey Baker is handcuffed in the back of a police car, the situation's under control. It's all done. Everything's quiet. She's sitting there. The other officer goes into the – I'm sorry. Was her seatbelt on at vertical, or was she laying down? She was laying down. She was bent over on her side, which is perfect until she's ready to move in the vehicle. And we don't know what the next two minutes or an hour – we don't know how long stuff was going to be inside the house. And she wasn't kicking or anything? No. She wasn't kicking the door. The door was closed. I mean, okay. The door was closed. She was sitting there, and all was calm. All was calm, and all was under control. And it was Styrison who precipitated the whole event by thinking that he needs her to sit up and sit up right now, and he's going to use force to do it unless she agrees to it. And she wasn't in a position to do much. I mean, they had almost – they had a drag ring on the porch. She was limp. She was lifeless, you know. So my point was when she's in the back of the police car, it's all under control. Take her to jail, and it's all done. If she needs to – you know, she could slump over the same way on the right there, just like she was then, but she's in a perfect position, actually, on her side, you know, as far as asphyxiation is concerned. I heard counsel mention a lot of things that are not in their brief, how important these things are, about post-trial motions or motions for directed verdict. It's not briefed in their brief. The motion that they filed was kind of bizarre. They claimed that we should have objected to Styrison's admissions. Now, I've tried a lot of cases. I always try to get the other side to give admissions, don't object to them. They thought we should have objected to admissions from the witness. And here's what the witness admitted. It's on pages 16 and 17 of our brief. Question. If you cannot justify all the use, the taser that you used on Kelsey Baker, would you agree that you used excessive force on Kelsey Baker? Correct. Answer. Correct. Question. So if you used your taser and it was unaccounted for, you would agree that was excessive force. Answer. If you used the taser on a person unaccounted for, yes. Those are the admissions that he gave. He also broke down and said, I cannot dispute the computer printer. I do not dispute that. I do not dispute. It shows four times. Their attorneys admitted that in an opening statement. They admitted throughout the trial. The computer printout was reliable. They did not challenge it. And it shows four shots in less than two minutes. And two of them are unaccounted for. And they should not be allowed to deny the undeniable.  And that's our kick. I don't think that he should be allowed to use a taser from one time. But four, to get her to sit up. Or two, to get her to sit up. Our Constitution doesn't allow that. It doesn't allow use of force on somebody who is limp and possibly injured or intoxicated, who can't obey command. That's not the policy I hope this court wants to set. There's a lot of kids in this situation. And they should be treated safely, securely. The duty of the police is to serve and to protect. And she needed protection. Thank you. Okay. This matter will be taken under advisement. And an opinion will be coming forthwith. Court will take a brief recess.